FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 JUL 20 AM 8:38

U.S. DISTRICT COURT
N.D. OF ALABAMA

PATRICIA BEARDEN,         )
                          )
           Plaintiff,     )
                          )
v.                        )   CASE NO. CV 98-B-2985-S
                          )
THE UNITED METHODIST      )
CHURCH NORTH ALABAMA      )
CONFERENCE BIRMINGHAM     )   ENTERED
WEST DISTRICT,            )
                          )   JUL 2 0 1999
           Defendant.     )

## MEMORANDUM OPINION

Currently before the court is the Motion to Dismiss filed by the "North Alabama Conference of The United Methodist Church" ("North Alabama Conference" or "Conference") pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.[1] Plaintiff's complaint named three separate defendants: the North Alabama Conference, The United Methodist Church, and the Birmingham West District. By a contemporaneously entered Order, the defendant identified as "The United Methodist Church" has been dismissed, without objection from plaintiff, based on the parties' acknowledgment that no such jural entity exists. The third defendant, the

---

[1] The Conference attached to its Motion to Dismiss, the affidavit of Jerry E. Sisson, District Superintendent of the Birmingham West District of the North Alabama Conference. This affidavit clarifies the plaintiff's status as "clergy" throughout her appointment, and establishes that the only appropriately-named defendant is a religious entity. Because the affidavit is submitted for the limited purpose of supporting the North Alabama Conference's claim that the court lacks subject matter jurisdiction, the affidavit does not convert the motion to dismiss into a Rule 56 motion for summary judgment as otherwise would occur when matters outside the pleadings are submitted under Rule 12(b). *Drevlow v. Lutheran Church, Missouri Synod*, 991 F.2d 468, 470 (8th Cir. 1993)("the district court has the authority to consider matters outside the pleadings on a motion challenging subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."); *See, e.g., Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981), (district court has power to decide disputed factual issues in a motion to dismiss under Rule 12 (b)(1)) *cert. denied*, 454 U.S. 897 (1981).

"Birmingham West District" is not an independent entity. The parties agree that it is an operating division of the North Alabama Conference. Consequently, the only viable defendant to the plaintiff's Complaint is the North Alabama Conference.

The North Alabama Conference contends that this court lacks subject matter jurisdiction over the plaintiff's unspecified pendent state law claims and claims under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e *et seq*. Upon consideration of the record, the relevant law, the submissions of the parties, and the argument of counsel, the court finds that the Motion is due to be granted.

## FACTUAL SUMMARY

In her Complaint, Patricia Bearden ("plaintiff"), alleges that she was discriminated against, on the basis of her sex, while serving as a minister of The United Methodist Church. (Pl.'s Compl. ¶ 1). Plaintiff began her employment as a minister in 1997 and was approved for service by the North Alabama Conference as a clergy person. (Pl.'s Compl. ¶6; Sisson Aff. ¶ 3). The Conference is the governing body encompassing all United Methodist Churches in the northern half of the State of Alabama. (Sisson Aff. ¶ 2). Throughout her appointment, the plaintiff provided religious ministry to parishioners of two local congregations affiliated with The United Methodist Church. (*Id.* at 3). Among her duties, plaintiff was required to preach, perform pastoral, counseling services, and administrative duties, and to serve on various councils, boards and commissions. (*Id.* at 3).

In June of 1997 the North Alabama Conference assigned plaintiff to serve as a minister at Providence United Methodist Church and at Bradford United Methodist Church, in Pinson, Alabama. (Pl.'s Compl. ¶ 3). She served as the pastor of both these congregations until March 25, 1998. (*Id.*). According to her Complaint, the plaintiff was terminated because she was a

female. (*Id.*). Plaintiff alleges that at the time she was appointed, Providence Methodist Church advised the District Superintendent that half of its members did not want a female minister. (Pl.'s Compl. ¶ 7). Plaintiff also alleges that from the beginning of her appointment she was told by members of the congregation that they did not want a female minister. (*Id.* at ¶ 8).

## DISCUSSION

### The First Amendment Defense

The First Amendment commands Congress to "make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend. I. The court finds that plaintiff's claims against the North Alabama Conference are barred by the "free exercise clause" and the "establishment clause" of the First Amendment.

#### A. The Free Exercise Clause.

The Supreme Court has held that the Free Exercise Clause provides religious institutions with the "power to decide for themselves, free from state interference, matters of church government, as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952). Accordingly, federal courts have been consistent in their rejection of employment discrimination claims brought by members of the clergy against their employers, holding that the Free Exercise Clause "precludes civil courts from adjudicating employment discrimination suits by ministers against the church or religious institution employing them." *EEOC v. Catholic Univ. of America*, 83 F.3d 455, 461 (D.C. Cir. 1996)(thoroughly analyzing application of the Free Exercise Clause to employment discrimination actions); *see also Scharon v. St. Luke's Episcopal Presbyterian Hospitals*, 929 F.2d 360 (8th Cir. 1991)(Title VII and ADEA claims); *Minker v. Baltimore Annual Conference of the United Methodist Church*, 894 F.2d 1354 (D.C. Cir. 1990)(ADEA claim); *Natal v.*

*Christian and Missionary Alliance*, 878 F.2d 1575 (1st Cir. 1989)(wrongful termination claim).

Judicial involvement in employment discrimination claims by ministers would encroach on "the constitutional right of a church to manage its internal affairs . . . " in violation of the First Amendment. *Catholic Univ.*, 83 F.3d at 460. The "minister exception" was discussed by the Fifth Circuit Court of Appeals in *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972), *cert. denied*, 409 U.S. 896 (1972). The court in *McClure* noted:

> [t]he relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection. It is unavoidably true that these include the determination of a minister's salary, his place of assignment, and the duty he is to perform, in the furtherance of the religious mission of the church.

*McClure*, 460 F.2d at 558-59. The exception applies to both members of the clergy and to lay employees whose "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." *Catholic Univ.*, 83 F.3d at 461.

The Eighth Circuit has addressed the issue presented in this case and relied on the Free Exercise Clause of the First Amendment to reject the employment discrimination claim of a clergy person. In *Scharon v. St. Luke's Episcopal Presbyterian Hospitals,* 929 F.2d 360 (8th Cir. 1991), an ordained Episcopal priest filed a lawsuit against her employer alleging that she was terminated based on her age and sex in violation of Title VII and the ADEA. In denying the priest's claims, the Eighth Circuit held:

> . . . the Free Exercise Clause of the First Amendment [] prohibits the courts from deciding cases such as this one. Personnel decisions by church-affiliated institutions affecting clergy are *per se* religious matters and cannot be reviewed by civil courts, for to review such decisions would require the courts to determine the meaning of religious doctrine and canonical law and to impose a secular court's view of whether in the context of the particular case religious doctrine and canonical law support the decision the church authorities have made. This is precisely the kind of judicial second-guessing of decision-making by religious organizations that the Free Exercise Clause forbids.

*Id.* at 363 (emphasis in original); *see also Drevlow v. Lutheran Church, Missouri Synod*, 991 F.2d 468, 471 (8th Cir. 1993)( "[Ministers] claim that the [church] violated its own bylaws by removing his name from its list of eligible ministers falls squarely into the category of claims that are not justiciable by secular courts.").

Courts have repeatedly found that even the paramount interest of eradicating discrimination in employment impermissibly burdens the free exercise of religion when it encroaches on the ability of a religious denomination to practice its religious beliefs or manage its own internal affairs. For example, in *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1167 (4th Cir. 1985), the court was called upon to decide whether applying Title VII to a church would violate the Free Exercise Clause where the plaintiff alleged she had been denied the position of pastoral advisor on the basis of her race and gender. The court observed that it would be "difficult to exaggerate the magnitude of the state's interest in assuring equal employment opportunities for all. . . . " 772 F.2d at 1168. Nonetheless, the court concluded that the balance of interests weighed in favor of free exercise of religion. *Id.* It observed that a pastoral advisor, although not ordained, was responsible for introducing children to the life of the church, for leading small congregational groups in Bible study, and for serving as a counselor to a singles program. *Id.* In the eyes of the court, "[a]ny one of these functions so

embodies the basic purpose of the religious institution that state scrutiny of the process for filling the position would raise constitutional problems; when all the functions are combined, the burden of potential interference becomes extraordinary." *Id.*

As the Seventh Circuit has recognized, ". . . in a direct clash of 'highest order' interests, the interest in protecting the free exercise of religion embodied in the First Amendment to the Constitution prevails over the interest in ending discrimination embodied in Title VII." *Young v. Northern Illinois Conference of United Methodist Church*, 21 F.3d 184, 185 (7th Cir. 1994). In view of the foregoing authority, and in the absence of any decisions to the contrary, it is clear that the plaintiff's claims in this case are barred by the Free Exercise Clause of the First Amendment.

     **B.**    **The Establishment Clause**.

The Establishment Clause of the First Amendment also bars plaintiff's claims. The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion. . . " U.S. Const. Amend. I. In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Supreme Court articulated a three-part test to determine whether a statute violates the Establishment Clause: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." 403 U.S. at 612-13 (internal citations omitted).

Courts have held that civil courts may not review employment discrimination claims by clergy based on the third factor under *Lemon* regarding government entanglement with religion. For example, in *Young v. Northern Illinois Conference,* the Seventh Circuit rejected a minister's Title VII race, sex and retaliation claims against the Northern Illinois Conference of the United

Methodist Church holding in part that "civil court review of ecclesiastical decisions of church tribunals, particularly those pertaining to the hiring or firing of clergy, are in themselves an 'extensive inquiry' into religious law and practice, and hence forbidden by the First Amendment." *Young,* 21 F.3d at 187.

### Plaintiff's Opposition

Plaintiff argues that application of the federal anti-discrimination laws to religious institutions does not pose a serious risk of violating the religion clauses of the First Amendment. (Pl.'s Mem. in Opp'n to Def.'s Mot. Dismiss at 2). In support of her contention, plaintiff cites *DeMarco v. Holy Cross High School,* 4 F.3d 166 (2d Cir. 1993) and *Lukaszewski v. Nazareth Hospital,* 764 F.Supp. 57 (E.D. Pa. 1991). Plaintiff's reliance on these decisions is misplaced. Each case is distinguishable on its facts, as the plaintiffs in each case were secular employees. Plaintiff did not cite a single case involving a minister in which a court has allowed Title VII to override the First Amendment's guarantee of separation of church and state, in personnel matters affecting clergy.

In *DeMarco,* the plaintiff was a lay person who had been employed as a math teacher by Holy Cross High School. 4 F.3d at 168. Although the plaintiff was hired as a math teacher, his duties also included leading students in prayer and taking them to Mass. (*Id.*). The court allowed the plaintiff's employment-related claims to proceed, but was careful to distinguish the facts before it from cases involving ministers:

> Holy Cross relies in part upon cases that hold that the ADEA is inapplicable to claims brought by members of the clergy against their religious employers. *See, e.g., Scharon v. St. Luke's Episcopal Presbyterian Hosp.,* 929 F.2d 360, 363 (8th Cir.1991); *see also Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1356-58 (D. C. Cir. 1990). These cases are inapposite, since each one deals with the

-7-

> pervasively religious relationship between a member of the clergy and his religious employer. *Cf. Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1170-71 (4th Cir. 1985)(Title VII case; distinguishing between personnel decisions involving selection of spiritual leaders - which are not subject to governmental inquiry - and decisions involving secular teachers in church approved schools, which are not beyond governmental inquiry), *cert. denied*, 478 U.S. 1020, 106 S. Ct. 3333, 92 L. Ed. 2d 739 (1986).

4 F.3d at 171-72; *accord, Weissman v. Congregation Shaare Emeth*, 38 F.3d 1038, 1040 (8th Cir. 1994)(plaintiff could maintain an ADEA action against religious entity because, as "temple administrator . . . [h]e was not a member of the clergy and played no role in decisions relating to spiritual matters.").

Plaintiff also relies upon *Lukaszewski v Nazareth Hospital*, 764 F.Supp 57 (E.D. Pa. 1991). In that case, the plaintiff was the "director of plant operations" at a Roman Catholic affiliated hospital. (*Id.* at 58). His duties included overseeing the operation of the physical facilities at the hospital. (*Id.*). The court observed that "[a]n Establishment Clause violation is also less likely . . . because Nazareth is not an educational institution, but a hospital employing over 1400 persons. Religious doctrine is a much less important factor in most hospital personnel decisions that it is in religious school decisions to hire and fire teachers." (*Id.* at 60). Thus, the court allowed the plaintiff's claims to proceed. In the present case, plaintiff, as a minister, provided religious ministry to the parishioners in the two congregations she served. These duties included preaching, performing pastoral and counseling services, and serving on councils, boards and commissions related to her congregations. Therefore, the court does not find that the *DeMarco* or the *Lukaszewski* cases are helpful to plaintiff's case.

## CONCLUSION

The touchstone of the cases relied upon by this court, decided under both the Free Exercise and the Establishment Clauses, is the notion that the right of churches to freely choose and govern their own clergy is at the core of their ability to function and promulgate their faith. This point was well made by the Fifth Circuit Court of Appeals in *Simpson v. Wells Lamont Corp.*, 494 F.2d 490 (5th Cir. 1974), where an expelled minister sought damages and other relief under 42 U.S.C. § 1981 and other civil rights statutes. The court observed:

> This case involves the fundamental question of who will preach from the pulpit of a church, and who will occupy the church parsonage. The bare statement of the question should make obvious the lack of jurisdiction of a civil court. The answer to that question must come from the church.

494 F.2d at 492.

The North Alabama Conference's Motion to Dismiss for lack of subject matter jurisdiction is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously with this Opinion.

DONE this 19th day of July, 1999.

SHARON LOVELACE BLACKBURN
United States District Judge